# NANTUCKET COUNTY.

## Frederick W. Paddock *vs.* Commercial Insurance Company
## Edward Field *vs.* Same.

No constructive total loss can be claimed by reason of a sale of a vessel at a port of distress, unless the sale is made by the master, if he is present and in charge of the vessel.

No recovery can be had for an actual total loss occasioned by a storm by which a vessel and her outfits are destroyed in a port of distress into which she has put, and where, before the occurrence of the storm, she has been surveyed, condemned and sold, under the direction of the consul of the United States, and her cargo transshipped, and her master has given up all attempt to prosecute the voyage in her.

The wrongful seizure and sale of a cargo by a consul of the United States is not a loss under a clause in a policy which insures against the acts of pirates and assailing thieves.

Paddock & Field *v.* Commercial Insurance Company.

In an action on a policy of insurance, the evidence proved that a seaworthy whaling vessel encountered a gale and sprung a leak, which made it necessary to take in sail and put all hands to the pumps, and throw the try-works overboard, in order to lighten her; that the leak was stopped to such an extent that the vessel did not leak except when sail was carried on the foremast, or, even in that case, so as to require more than one hour in four at the pumps to free her; that the master was of opinion that the leak did not render her unseaworthy and unable to continue the voyage without putting into a port of distress, but was forced by the crew to do so, for reasons which were not distinctly shown; that, while in the port of distress, against his protest, the vessel was surveyed and condemned, but the survey was not put in evidence, although called for by the defendants, and the reasons for the condemnation were not fully disclosed: *Held,* that these facts were insufficient to allow the insured to claim for a constructive total loss of the vessel and outfits, by reason of a necessary sale at a port of distress, from perils of the sea; or of the catchings which had replaced the outfits consumed, and which had been transshipped, in port into a vessel which was afterwards wrecked.

Two actions of contract on policies of insurance, issued by the defendants. The first policy was dated October 7th 1851, and insured the plaintiff Paddock in the sum of $5000, " on the ship Rambler and outfits, half on each, at and from Nantucket this day, to the Pacific Ocean on a whaling voyage, during her stay and fishing there or elsewhere and back to Nantucket, with the usual liberties, and liberty to ship home the first year's catchings, provided the voyage be not prolonged in consequence of such shipment." The policy also contained the usual clause in whaling risks, that " it is understood and agreed that one fourth of the catchings shall replace the outfits consumed." The second policy insured the plaintiff Field in the sum of $3500, on the same ship and outfits, and in the same terms. The vessel sailed upon the voyage insured, which was prosecuted without any occurrence which is now important, until her arrival at Lahaina in October 1855, with a leak in the scarf of the stem. Repairs deemed sufficient were there made, and the vessel, shortly after resuming her homeward voyage, encountered a gale and sprung a leak and put into Apia, where she was surveyed, condemned and sold, with her outfits, under circumstances which are stated in the opinion, and the cargo was transshipped into another vessel, the St. Mary, which was lying in port. After this sale, and before the St. Mary got to sea, both vessels were wrecked and lost in a gale, and the oil saved by rafts, and left in the care of the United States consul, who was

soon after succeeded in his office by another person, by whom it was confiscated and sold for a merely nominal price.

The cases were tried together by consent in this court, before *Merrick,* J., and were reported, upon the evidence introduced by the plaintiffs, for the determination of the whole court, whether the plaintiffs were entitled to recover either for a total or a partial loss. The other material facts are stated in the opinion.

*S. Bartlett & J. H. Clifford,* for the plaintiffs, cited *Abbott* v. *Broome,* 1 Caines, 292; *Manning* v. *Newnham,* 3 Doug. 130; *Gordon* v. *Massachusetts Ins. Co.* 2 Pick. 264; 2 Arnould on Ins. 817, 842, 1087; *Bryant* v. *Commonwealth Ins. Co.* 13 Pick. 555, 559; *Mitchell* v. *New England Ins. Co.* 6 Pick. 117; 2 Phil. Ins. § 1497.

*B. R. Curtis,* for the defendants, cited *Smith* v. *Manufacturers' Ins. Co.* 7 Met. 448; *Peirce* v. *Ocean Ins. Co.* 18 Pick. 91; *Bell* v. *Nixon,* Holt, N. P. C. 423; 2 Arnould on Ins. 1010; *Doyle* v. *Dallas,* 1 M. & Rob. 48; *Ruckman* v. *Merchants' Louisville Ins. Co.* 5 Duer, 367.

BIGELOW, C. J. The agreement, under which these cases were taken from the jury to be submitted to the determination of the court, renders it necessary to examine with care the evidence offered by the plaintiffs to sustain their claims for a total loss. It is to be observed in the outset that the inquiry is not whether the court, acting in the place of jurors, would find a verdict in favor of the plaintiffs on this issue; but whether, if such verdict were found by a jury, the court would feel it to be their duty to set it aside, as not supported by the facts in proof.

The first and most important branch of this inquiry, on which the decision of the whole case must turn, is, whether there is any adequate and sufficient proof that the sale of the vessel was a legitimate and necessary consequence of any peril covered by the policies. The evidence on this point comes from a single witness, the master of the vessel. Leaving out of view, as immaterial to the question under consideration, the history of the voyage prior to the arrival of the vessel at Lahaina, in the Sandwich Islands, in October 1855, it appears satisfactorily by the testimony of the master and by the certificate of two shipmasters,

dated October 15th 1855, that she was then in a seaworthy condition ; that she left that port about the 26th or 27th of that month, arrived at Honolulu, (at which port she touched,) in about ten hours, and thence left in the prosecution of her voyage ; that in five or six days after leaving Honolulu the wind increased to a gale, with a heavy cross sea, which continued for three or four days; that while the vessel was hove to in this gale, she commenced suddenly to leak; and that in consequence of this leak it became necessary to take in sail, to put all hands to the pumps, and also to throw the try-works overboard, in order to lighten the ship. It was the leak thus occasioned which the plaintiffs allege to have been the peril which rendered the ship unseaworthy, and authorized and justified the subsequent proceedings which resulted in her sale and the final breaking up of the voyage. But it seems to us that the difficulties in the way of the conclusion that this sale was made under circumstances which constitute a valid claim for a constructive total loss, are insurmountable. In the first place, it appears that the master was of opinion that the leak did not render the ship unseaworthy, so that she could not continue her voyage without putting away for a port of necessity. As soon as it was discovered it was stopped, and the vessel did not leak except when sail was carried on the foremast, and then only to such an extent that one hour in four at the pumps would free her, and the crew were not at any time exhausted by their labor in keeping her clear of water. The master did not change his course. He testifies, however, that he was forced by his crew to put away for Apia. But it does not appear affirmatively that, in coercing the master, the crew were actuated by a belief that this leak rendered the vessel unsafe. The master does not so testify. For aught that is shown, the crew may have acted from caprice or a mutinous spirit, or from a belief that the vessel had become unfit for a further prosecution of the voyage by reason, not of any sea peril, but of decay or injury from worms. Viewed in the strongest light in favor of the plaintiffs, the evidence affords only a remote inference from the conduct of the seamen, which is not supported by any direct proof, but is contradicted by the testimony

Paddock & Field *v.* Commercial Insurance Company.

of the master, and which is fairly open to the suggestion, that it leads to a result quite as consistent with the idea that they acted on a false pretext, or from apprehensions founded on other causes than the condition of the vessel arising from the leak. In this state of the evidence, it is certainly very difficult to say that the plaintiffs have established by satisfactory proof that, when the vessel put away for Apia, she had sustained any damage which rendered her unseaworthy or unfit to pursue her course, until she could reach some port of repair in the regular prosecution of her voyage. The evidence of the master tends strongly to show that such was not the fact, and there is no direct and positive proof to the contrary. The argument submitted in behalf of the plaintiffs seems to us to assume two facts which are not established by the proof. One is, that the officers united with the crew in coercing the master to change his course. This is not so. It was the crew only who joined in compelling him to put away for Apia. The other is, that the leak was so great as to be the sole motive which prompted the men to take such action. As already stated, there is no evidence which will justify such a positive inference.

We come in the next place to the proceedings which took place after the arrival of the vessel at Apia. From these nothing appears to change the statement made by the master concerning the nature or extent of the leak, or to show that the vessel, for that cause or any other arising from sea peril, was in such an unseaworthy condition, or so injured, that she could not proceed on her course, and reach some port where suitable repairs could have been made to enable her to complete her voyage. It is a little remarkable that the plaintiffs should have left their case without a particle of evidence to prove, from an examination of the vessel at Apia, that the master erred in his opinion that there was no necessity for putting into that port, or that the crew had good reason for forcing the captain to go there in consequence of the leak, or other sea damage. They did not venture to interrogate the master on this subject. If such evidence could have been procured, it certainly is reasonable to suppose that the plaintiffs would have produced it, especially in a case

where the testimony of the master is so vague in relation to the main facts, which it is incumbent on them to establish. So far as any inference can be drawn from the circumstances in proof concerning the survey, it is unfavorable to the plaintiffs' case. The master did not concur in calling for it, and he protested against it, and all proceedings under it. So far as its contents are disclosed, it would seem that the condemnation and sale of the vessel were founded, not upon any causes occasioned by a peril insured against, but upon the rottenness of her timbers, and decay arising from their being eaten by worms. From these circumstances, as well as from the failure of the plaintiffs to produce the survey, and allow it to be put in evidence, it certainly must be presumed that it would in no respect aid them in sustaining their claim for a constructive total loss.

It is urged very strongly in behalf of the plaintiffs, that it appears by the testimony of the master that there were no facilities at Apia for repairing a vessel in the condition in which the Rambler was on her arrival at that port. This is true ; and it is a circumstance which would be entitled to great weight in deciding the question of a constructive total loss by a necessary sale at a port of distress, if it appeared that the vessel was then innavigable and unable to proceed further without making repairs. But the evidence in the case fails to show this. The master does not testify that he could not have repaired the sea damage at Apia, nor is it shown that the vessel could not have proceeded thence, after slight and inexpensive repairs, to a port where it would have been practicable to repair her at a very moderate cost.

But there is still another difficulty. To constitute a constructive total loss, in the absence of proof of damage to the extent of half the value of the vessel, after deducting one third new for old, the plaintiffs are bound to show that the sale was made by the master, acting in good faith for the benefit of all parties interested, and under the pressure of a necessity produced by the perils against which they were insured by the policies. The defendants have a right to insist that this discretion which the law vests in the master shall be exercised by him. No other

person has the legal power or authority to act as the agent of the parties in making such sale, when the master is present and in charge of the vessel. It is a delicate and important trust, which cannot be delegated or taken away.

On looking at the testimony of the master with care, it does not appear that the sale of the vessel was made with his sanction or under his authority. On the contrary, it would seem, from his statement, that he protested against the survey and all proceedings under it to Van Camp, the American consul, who appears to have been the active agent in procuring the survey and in selling the vessel and outfits. From the time when the master was forced by his crew to put away for Apia until after his arrival there, and in the steps which led to the survey and sale of the vessel, he seems to have been under a sort of *vis major*, and to have exercised no active control over any of the proceedings.

From the view which we have taken of the evidence offered by the plaintiffs, these results follow :

First. There is no evidence to warrant a jury in finding that the vessel was injured by any sea peril, so as to render her innavigable or to prevent her from proceeding on her course, and making repairs in a port to be reached in the regular prosecution of her voyage.

Secondly. It does not appear that there was any sale of the vessel by the master in consequence of sea damage in the supposed port of distress.

Thirdly. There is no evidence to show that the damage to the vessel was such that she could not have been repaired for less than half her value after deducting one third new for old.

Fourthly. Therefore the plaintiffs would not be entitled to hold a verdict for a constructive total loss of the ship.

It was suggested, though not strenuously urged, by the counsel for the plaintiffs, that they might recover for an actual total loss by reason of the destruction of the ship by the storm in the harbor of Apia, after the sale by auction and the discharge of her cargo. But the answer to this claim of the plaintiffs is obvious and decisive. The vessel at the time of the loss was

not prosecuting the voyage for which she was insured, and was no longer covered by the policies. The evidence clearly shows something more than a mere intention to deviate. The vessel had been condemned and sold; the cargo had been transshipped for the purpose of being transported in another bottom; the master had yielded to the force of circumstances, and had given up all attempt to prosecute the voyage in the original ship; more than a month had elapsed after her arrival in Apia before she was wrecked, and there is an absence of all proof that any such delay or any transshipment of the cargo would have been necessary in order to repair the leak and proceed on the voyage Leaving out of view the fact that the evidence tends to show that the plaintiffs have ratified the sale of the vessel, and treated the voyage as thereby terminated, it is too clear to admit of doubt that there was an actual abandonment of the voyage before the vessel was wrecked in the harbor of Apia.

The claim for a loss of the outfits is substantially disposed of by the view which we have taken of the evidence offered to show a constructive loss of the vessel. The plaintiffs having failed to prove any sale of the vessel by the master, or any injury by sea damage to justify such sale, cannot recover for the outfits which were sold with the vessel. Nor can they recover for those which had been converted into catchings, and which were afterwards transshipped and subsequently taken and sold by the consul. There is no evidence that there was any necessity for the taking out of the cargo. For aught that appears, the vessel might have been made seaworthy, or at least capable of proceeding on her voyage so as to reach a port where repairs could be made, without transshipment of the cargo. The case therefore comes within the well settled principle, that, if a cargo is insured by a particular vessel, and transferred unnecessarily to another, the risk is thereby changed, and the insurers discharged. 1 Phil. Ins. § 983. *Oliverson* v. *Brightman*, 8 Ad. & El. N. S. 781. *Bold* v. *Rotheram*, Ib. 797. But a more conclusive answer to this part of the plaintiffs' claim is, that the oil was not lost by a peril insured against. The seizure and sale of the cargo by the consul does not come within any of the risks

assumed by the defendants. The only clause in the policy under which it is suggested by the counsel for the plaintiffs that the loss may fall is that which insures against the acts of "pirates, assailing thieves," &c. But the facts do not show nor justify the inference that the acts of the consul were such as to be properly characterized as plunder or robbery by force. They do not amount to a criminal appropriation of the property. It would be going too far to say that the acts of a public officer of the United States, in taking possession of property under color of legal proceedings and a claim of right, are to be deemed to have been felonious. So far as the facts are disclosed by the evidence, they prove a tortious conversion and not a theft. Viewed in the most favorable light for the plaintiffs, the nature of the transaction is left in doubt, and, the burden of proof being on them, they fail to show the loss to be within the risks covered by the policy.

The result to which we have arrived on the whole case is, that the plaintiffs are not entitled to recover for a total loss of the ship and outfits; and that they do not show any loss of that part of the outfits which had been converted into catchings, which can be recovered in these actions.

*Judgment for a partial loss only.*